**DOWLING BROS., Limited, v. HARDEMAN.**

No. 4826.

Court of Appeal of Louisiana.
Second Circuit.

Nov. 2, 1934.

Parsons & Colvin, of Mansfield, for appellant.

S. M. Atkinson, of Mansfield, for appellee.

TALIAFERRO, Judge.

This suit is for balance of $92.47 on open account for goods, wares, and merchandise sold and delivered to defendant and his farm tenants during the year 1931. The account, without credits, totaled $1,640.50. There were only two credits thereon, viz., 10 per cent. commission on some or all of the tenant accounts and the net proceeds of sale of 55 bales of cotton as of August 11, 1932.

Defendant does not expressly deny the correctness of the account, except in so far as his reconventional demand may impugn its correctness, but admits that he purchased goods, wares, and merchandise from plaintiff during 1931. A special defense is principally relied upon to defeat the suit against him. He avers that at plaintiff's request in the early part of the autumn of 1931 he delivered to it 55 bales of cotton against the account, with the distinct understanding that it would be withheld from sale to await better market conditions, the price then being very low, but with the right in plaintiff to ship the cotton and draw money thereon; that on or about March 2, 1932, he instructed plaintiff to sell the cotton, but was informed by its president, Mr. M. M. Dowling, that money had been borrowed on the cotton under such conditions that it could not be forced to sale before August 1st, following; that he then protested against the cotton having been so handled, without his knowledge or consent, that he lost control of its sale; that on August 11th plaintiff delivered to him a statement dis-

closing that the cotton had been sold under a seasonal pool agreement with the Louisiana Cotton Co-operative Association for a gross price of $1,700.38, being about 6.15 plus cents per pound, but that he informed plaintiff he would not accept settlement of the account on such basis.

He alleges additionally that on or about March 3, 1932, when he desired to sell his cotton, and so advised plaintiff, the market price thereof was not less than 7.75 cents per pound, its value then being $442.43 more than the price it actually sold for, and that on August 11th, the price was not less than 8.18 cents per pound; that by the illegal sale of the cotton he has suffered loss of not less than $442.43, for which he prays for judgment in reconvention.

From a judgment for plaintiff as prayed for, and against his demand in reconvention, defendant appealed.

So far as the main demand is concerned, the lower court's judgment is final. Section 1, art. 7, of Constitution of 1921. As to the reconventional demand, its disposition turns upon a question of fact which the trial judge has resolved against defendant. Knowing the parties involved and the witnesses introduced by each, and having heard the trial throughout, error on his part would have to be manifest to justify us in reversing his findings on the fact question involved, viz., Did defendant authorize plaintiff to place his cotton in the seasonal pool with the Co-operative Association? We are not advised by either side whether the court below found that plaintiff's version of this controverted fact question had been established, or whether it was held that defendant had failed to prove by a preponderance of the evidence his contentions with respect thereto.

In the fall of 1931, due to unprecedented economic conditions, the cotton market was not in favorable condition for the producer. It was then selling for around 5 cents per pound, middling basis, which was below the cost of production. It was near impossible to borrow money on any sort of security. Merchants and financial institutions were experiencing difficulty to avoid failure. It was while these conditions prevailed that the Louisiana Cotton Co-operative Association, a governmental agency, financed by government funds, offered to advance money on cotton shipped to it. It submitted two plans to those wishing to avail themselves of the proffered assistance, viz., the seasonal pool and optional agreements. Under the seasonal pool plan the market price of the cotton, less 1 cent per pound, would be loaned thereon, but the consignor lost control of the cotton, its sale, and future handling. He had to authorize the association exclusively to sell his cotton as and when it saw fit, and account to him therefor not later than August 1st of following year. Regardless of fluctuations in the market, no margins would be called for. If the cotton, when sold, failed to bring enough to pay the advances against it, the association absorbed the loss; if it sold for more than was advanced on it, the consignor was entitled to the excess, less interest and expenses. This was an extremely fair offer to the consignor and producer, all things considered. Under the optional agreement less money would be loaned on cotton than under the seasonal pool plan, and the shipper retained control of the cotton and could have it sold when he desired.

During the ginning season of 1931, plaintiff shipped some 500 bales to the association, including that of defendant, all of which was placed under seasonal pool agreement, and against which he drew the maximum amount. Its president is positive he explained in detail to defendant the nature and conditions of the association's seasonal pool agreement, and that defendant authorized him to handle his cotton in the same manner plaintiff was handling its own. Defendant is as equally positive that plaintiff's president did not do this; and is as positive that he never consented to have the cotton so placed as to be beyond his control and direction as to selling same. Plaintiff's bookkeeper partially corroborates its president's evidence on this point. He testified that the president, with defendant present, in plaintiff's store, told him that defendant had agreed to turn over the 55 bales on his account, and desired it shipped and handled exactly in the same manner plaintiff's other cotton was being handled; and that defendant did not protest or object to the statement of the president. Defendant's defense of his silence when this occurred is that he was uninformed as to how plaintiff intended handling its cotton, but assumed it would not get beyond the control of either of them.

If the cotton had been sold on the March, 1932, market, the proceeds would have been in excess of the account due by him to plaintiff. If sold when delivered to plaintiff, it would have lacked several hundred dollars of paying the account. Plaintiff had a lien on the cotton and could have enforced it at the time the cotton was delivered to him as the account was then due. Whatever concessions plaintiff extended to defendant in this respect were purely gratuitous. Its money and sup-

plies enabled defendant to produce the crop, and the method the cotton was handled, after delivery to plaintiff, realized some $300 more than it would have brought had it been sold at time of such delivery. Had the cotton been shipped to a commission merchant and an amount drawn against it, its sale could have been forced at such time as the merchant desired. Act No. 44 of 1882.

We are persuaded, after a careful study of the record, to the conclusion that plaintiff's position in this case is sustained by the testimony and circumstances having material bearing upon the transactions out of which this litigation arose, and that the judge of the lower court has correctly disposed of the case.

Judgment affirmed with costs.